# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| FRANCES CRUZ,<br><br>                          Plaintiff,<br><br>        v.<br><br>CAROLYN W. COLVIN, ACTING<br>COMMISSIONER SOCIAL SECURITY<br>ADMINISTRATION,<br><br>                          Defendant. | Civil Action No. 2:13-cv-03367<br><br><br>**OPINION** |

**MCNULTY, District Judge**

## INTRODUCTION

Plaintiff Frances Cruz appeals the final determination of the Commissioner of the Social Security Administration (the "Commissioner") denying her disability benefits under the Social Security Act. This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). This motion has been decided based on the written submissions of the parties pursuant to Rule 78 of the Federal Rules of Civil Procedure. For the reasons set forth below, the decision of Administrative Law Judge Richard L. De Steno (the "ALJ") is **REMANDED**. On remand, the ALJ is directed to do the following:

**(1)** Develop the record, particularly by including consideration of supplemental Raritan Bay mental health records from July 11 through October 26, 2011;

**(2)** Reconsider Plaintiff's Directions for Mental Health (DMH) records and the report of Dr. Greenberg, and adequately explain his reasons for rejecting or relying on competent medical evidence;

**(3)** Considering all of the evidence, old and new, perform a *de novo* analysis of whether

the Plaintiff's mental and physical impairments, singly or in combination, render her unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).

## PROCEDURAL HISTORY

Plaintiff first filed an application for Supplemental Security Income ("SSI") payments from the Social Security Administration ("SSA") on February 25, 2009, alleging disability beginning June 1, 2005. (Tr. 14.)  Plaintiff's claim was denied initially, on August 28, 2009, and again upon reconsideration on December 14, 2009. (Id.)  On January 18, 2010, Plaintiff filed a written request for a hearing, pursuant to 20 C.F.R. § 416.1429. (Id.)  The hearing was originally set for November 17, 2010, in Florida. (Id.)  However, on November 3, 2010, Plaintiff requested that the hearing be cancelled and her file transferred to Newark, New Jersey. (Pl.'s Br. 6–7.)  Plaintiff appeared and testified at a hearing held before the ALJ on July 5, 2011, in Newark, New Jersey. (Tr. 14.)  Plaintiff was informed of her right to representation but chose to appear and testify *pro se*. (Id.)  On August 31, 2011, the ALJ determined that Plaintiff was not disabled. (Tr. 30.)  On March 25, 2013, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the Final Judgment of the Commissioner. (Id.)  Plaintiff subsequently initiated this action, requesting that this Court reverse or remand the ALJ's decision. (Pl.'s Br. 1.)

## MEDICAL BACKGROUND

Plaintiff placed before the ALJ an extensive medical history of physical infirmities. I touch on these in my discussion of the ALJ's Opinion, below. Because I am remanding for

2

deficiencies in the ALJ's treatment of mental health claims, I concentrate here on the mental health history.

### 1. DMH evaluations

On February 11, 2009, Plaintiff went to Directions for Mental Health ("DMH") for a psychiatric evaluation. (Tr. 367.)  Plaintiff was referred to DMH by her primary care physician. (Id.)  The psychiatrist who evaluated Plaintiff reported that Plaintiff's strengths included that Plaintiff had peer support, age-appropriate intellectual development, the ability to relate to others, and adequate education. (Tr. 371.)  The psychiatrist also reported that Plaintiff appeared appropriately dressed and groomed, had good hygiene, was interactive, pleasant, and cooperative, but was fidgety. (Id.)  The psychiatrist further noted that Plaintiff's speech, thought process, thought content, and cognitive functioning were all normal, that Plaintiff did not have any violent or homicidal thoughts, but that Plaintiff's mood was depressed. (Id.)   The psychiatrist's diagnosis was as follows: Axis I: mood D/O NOS; cocaine dependence; A.N., B.N.; R/O Bipolar D/O; Axis II: borderline personality traits; Axis III: HCV, glaucoma, narcolepsy, sleep apnea, acid reflux, angina, stage II cervical cancer; Axis IV: mod: recent legal stressors, medical problems, limited social support, family discord; Axis V: mGAF: 54. (Id.) The psychiatrist ordered that Plaintiff take Lexapro for her depression and anxiety, and Abilify for mood swings and impulsivity. (Tr. 372.)   The psychiatrist ordered laboratory tests for Plaintiff, including cbc w. diff, cmp, sh, lipid panel, uds, and ua. (Id.)  Plaintiff's reported risk assessments included current mood instability and a history of parasuicidal behavior, with a moderate suicidal potential. (Id.)   The psychiatrist noted that some interventions to reduce Plaintiff's risk would be to prescribe psychotropics, refer Plaintiff for substance treatment, and schedule more frequent appointments. (Id.)

3

On February 20, 2009, Plaintiff returned to DMH for a follow-up appointment, and ARNP Julie Stanphill noted that Plaintiff's appearance was the same as the last visit, except that Plaintiff's reported mood was moderately anxious. (Tr. 374.)  Plaintiff told ARNP Stanphill that she was getting married that weekend. (Id.)  Plaintiff's reported risk for suicidal potential was low. (Tr. 375.)  Her GAF at this time was reported to be 59. (Id.)

Plaintiff returned to DMH for another follow-up with Julie Stanphill, ARNP, on March 9, 2009. (Tr. 376.)  Plaintiff reported that she was depressed about two days per week, where she does not get out of bed and that she had been having mood swings. (Id.)  Plaintiff also reported that she experienced fatigue due to having HCV. (Id.)  Plaintiff's appearance, attitude, speech, thought process, thought content, and cognitive functioning were all normal. (Id.)  Her reported mood was euthymic, appropriate, and stable, and her risk for suicide was reported as low. (Id.)  Her GAF at this time was reported to be 56. (Id.)

On June 1, 2009, Plaintiff returned to DMH for another follow-up, and reported difficulty falling asleep, decreased appetite, and continued mood swings. (Tr. 783.)  Plaintiff reported that she was waiting for a referral for endoscopy, and that she was receiving vitamin b-12 injections once a month for pernicious anemia. (Id.)  Plaintiff's appearance, attitude, speech, thought process, thought content, and cognitive functioning were all normal. (Id.)  Her reported mood was moderately anxious, but she was not found to have suicidal or violent thoughts. (Id.)  Her GAF at this time was reported to be 56. (Id.)

On July 29, 2009, Plaintiff went back to DMH for another follow-up appointment, and reported anxiety, mood swings, sleeplessness, and loss of appetite. (Tr. 781.)  Plaintiff's appearance, attitude, speech, thought process, thought content, and cognitive functioning were all normal. (Id.)  Her reported mood was moderately anxious, but she was not found to have suicidal

4

or violent thoughts. (Id.) Her GAF at this time was reported to be 58. (Id.)

On October 14, 2009, Plaintiff had a follow-up at DMH. (Tr. 779.) She reported that her husband is supportive, but her fourteen-year-old daughter had been calling her and expressing suicidal ideations. (Id.) Plaintiff's reported mood was moderately anxious, but she was not found to have suicidal or violent thoughts. (Id.) Her GAF at this time was reported to be 55. (Id.)

Plaintiff went to the DMH again on November 6, 2009. (Tr. 842.) She reported that her daughter was depressed but did not have any history of suicide attempts. (Id.) Plaintiff's reported mood was moderately anxious, but she was not found to have suicidal or violent thoughts. (Id.) Her GAF at this time was reported to be 50. (Id.) The doctor prescribed Plaintiff Wellbutrin SR for her depression. (Id.)

### 2. Dr. Greenberg

Plaintiff was referred to Florida Center for Cognitive Therapy, Inc. ("FCCT") by the Division of Disability Determinations. (Tr. 438.) On July 27, 2009, Plaintiff visited FCCT, where she was evaluated by Dr. Michael S. Greenberg. (Id.) Dr. Greenberg conducted a clinical interview and mental status examination of Plaintiff, but did not receive medical or mental health documents supporting Plaintiff's allegation of disability for depression. (Id.) Dr. Greenberg noted that Plaintiff was neatly dressed and groomed, alert, and fully oriented. (Tr. 439.) Plaintiff's speech was logical and there were no reported indications of delusions or thought disorder, but Plaintiff claimed that she had heard voices and had seen shadows at home. (Id.) Plaintiff reportedly denied suicidal ideation, but her mood was depressed and anxious. (Id.) Plaintiff was able to recall one of three common objects after five minutes, and Dr. Greenberg noted that Plaintiff's working memory, abstract thinking, verbal reasoning, arithmetic ability, and fund of information were all impaired. (Id.) Dr. Greenberg diagnosed Plaintiff as follows:

5

Axis I: Major Depression, recurrent, severe, cocaine dependence (reportedly in remission); Axis II: Borderline Personality Disorder, R/O borderline intellectual functioning; Axis III: cancer reported; Axis IV: unemployment, medical problems reported, chronic dysfunction; Axis V: GAF = 48. (Tr. 439–40.)

### 3. Dr. Ragsdale

On August 28, 2009, Plaintiff was evaluated by Dr. Kevin Ragsdale. (Tr. 441–58.)  In his report, Dr. Ragsdale noted in the medical dispositions section that an RFC assessment was necessary, and that Plaintiff had coexisting nonmental impairment(s) that required referral to another medical specialist. (Tr. 441.)   Dr. Ragsdale based the medical dispositions on the following categories: 12.02 organic mental disorders (recorded as "r/o bif"); 12.04 affective disorders (recorded as "mood disorder, NOS vs. MDD"); 12.08 personality disorders (recorded as "BLPD"); and 12.09 substance addition disorders (recorded as "coc dep in sfr"). (Tr. 441–449.)   Dr. Ragsdale reported the degree of Plaintiff's functional limitations as follows: mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and insufficient evidence as to long episodes of decompensation. (Tr. 451.)  In his report, Dr. Ragsdale noted:

> [B]ased on the objective, professional observations of the claimant and descriptions of the claimant's functioning in the file, it appears that the claimant is able to accomplish a daily routine of basic personal, household and community activities relatively independently and effectively from a strictly psychological point of view.  The claimant's abilities to interact with others and sustain focused attention to complete tasks effectively and consistently appear to be interfered with, at least in part, by the psychiatric signs and symptoms.  The consistency between the claimant's and third party's statements regarding psychiatric symptoms and corresponding functional limitations and the objective medical evidence is marginal resulting in less than optimal credibility.

(Tr. 453.)  The doctor noted that Plaintiff's mental functioning would be adequate with treatment

6

and abstinence from cocaine, and that despite the psychiatric symptoms that could potentially lead to a reduction in Plaintiff's "most favorable functioning in some activities, the requisite cognitive abilities for completing simple routine tasks in a work setting remain preserved." (Id.)

Dr. Ragsdale also assessed Plaintiff's mental RFC on the same day. (Tr. 455–58.) The doctor reported that most of Plaintiff's mental activities were not generally significantly limited in the context of Plaintiff's capacity to sustain those activities over a normal workday and workweek, on an ongoing basis. (Tr. 455–56.) Some activities—such as Plaintiff's ability to complete a normal workday and workweek without interruptions from psychologically base symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, as well as Plaintiff's ability to maintain attention and concentration for extended periods—were reported to be moderately limited. (Id.) Dr. Ragsdale noted that the limitations he had acknowledged appeared to "be at least moderately, positively correlated with the psychiatric MDI(s) noted on the PRTF." (Tr. 457.) Nevertheless, the doctor reported that Plaintiff had "ample capacity to enact the principal cognitive abilities and social skills essential to the execution of simple, routine tasks in a full time employment setting." (Id.)

Dr. Ragsdale also conducted a physical RFC assessment of Plaintiff on August 28, 2009, based on a primary diagnosis of hepatitis A, B, and C, a secondary diagnosis of tendinitis in Plaintiff's bilateral thumbs, and migraines as an additional impairment. (Tr. 459–466.) Dr. Ragsdale reported that Plaintiff had the following exertional limitations: Plaintiff was reported to be able to occasionally lift or carry a maximum of fifty pounds, frequently lift or carry twenty-five pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push or pull with no limitations. (Tr. 460.) Dr. Ragsdale reported that Plaintiff may have had minor limitations in handling/gross

7

manipulation, and no visual, communicative, or environmental limitations. (Tr. 462–63.)

### 4. Dr. Putney

On December 11, 2009, Dr. Martha Putney conducted a psychiatric review technique on Plaintiff. (Tr. 536.)  Dr. Putney's medical disposition was that Plaintiff's impairments were not severe. (Id.)  Dr. Putney based this medical disposition on the following categories: 12.04 affective disorders (recorded as "depression/context psd. stable w/ abstinence/meds from ARNP"); 12.08 personality disorders (recorded as "antisocial bx/arrests/context polysubstance dependence"); and 12.09 substance addiction disorders. (Tr. 536–544.)  Under the section for substance addiction disorders, Dr. Putney noted that behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system. (Tr. 544.)  The doctor evaluated this under Listing 12.04-affective disorders, and Listing 12.08-personality disorders. (Id.)  Dr. Putney reported the degree of Plaintiff's functional limitations as follows: no restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no long episodes of decompensation. (Tr. 546.)

In her report, Dr. Putney went through Plaintiff's history and treatment, and noted that this was Plaintiff's fourth application for benefits. (Tr. 548.)  Dr. Putney noted that the mental portion of Plaintiff's claim from February of 2009 "was adjudicated as moderately impaired, but this was based on a mental CE, during which [Plaintiff] clearly malingered." (Id.)  Dr. Putney also stated that the current status of Plaintiff's polysubstance dependence was unknown, as Plaintiff dishonestly alleged to the September 2007 CE vendor that she had been clean and sober since September of either 2000 or 2002, when in fact Plaintiff's cocaine addiction was ongoing subsequently per the MER. (Id.)

8

Dr. Putney concluded that Plaintiff had no world-related mental impairment, but she did have a reduced motivation for responsible management of personal finances. (Id.) Dr. Putney also stated:

> [Plaintiff's] cognitive ability (cognitively intact with average range IQ) is adequate. [Plaintiff] is able to prepare meals, shop, do self-care, [household] chores, handle routine financial transactions, cognitively manage her finances (per the 9/07 CE), drive when has [sic] a vehicle (has a [history] of suspended [driver's license], but her [driver's license] had been re-instated as of the 9/07 CE), use public transportation when clean and sober.

(Id.) The doctor additionally noted that Plaintiff had indicated to a previous mental CE vendor in July of 2009 that Plaintiff had a history of seeing shadows and hearing voices, which led that vendor to report that Plaintiff had severe depression. (Id.) However, Dr. Putney noted that during her examination of Plaintiff, Plaintiff was able to be cooperative and appropriate when clean, sober, and compliant with her psych medications. (Id.) Dr. Putney also stated that, per Dr. Appenfeldt, Plaintiff's depressive symptoms were reactive to her medical condition and did not exceed the level of an "ADJ D/O" when clean and sober. (Id.) Plaintiff was reported to get along with friends, family, coworkers, the public, and authorities in the workplace. (Id.)

Dr. Putney further stated in her report that Plaintiff's "CPP" was mildly decreased, and that there were inconsistencies between Plaintiff's allegations and the objective evidence, which raised "significant credibility concerns." (Id.) Dr. Putney stated:

> [Plaintiff] alleged to the 7/09 CE Vendor (subsequent to the denial of her 2 prior claims) that she was unable to perform even simple mental status tasks, leading that vendor to offer a R/O for possible 'BIF,' and to opine that [Plaintiff] is unable to manage her finances. However, allegations of memory, cognitive, intellectual dysfunction are not consistent with the object evidence. She has no [history] of SLD, much less EMH, her medical [history] is negative for head or brain injury, tumor or surgery, TIA or CVA, cognitive or amnestic D/O. Her MSE was completely WNLs during the 9/07 CE (normal attn., conc, math skills, fund of info, calculative ability, intact IM, [short term memory, long term memory]), and she remains cognitively intact per the recent ARNP notes, physical MER and

9

> Physical CE when mental disability was not on the line.  Per POMS 23025.0254, allegations of dysfunction are disregarded in cases where there is clear evidence of malingering.  She has a 10th grade education in mainstream classes, consistent with average range IQ, which is adequate for all ADLs as well as for at least moderately complex tasks in the workplace.

(Id.)  Finally, Dr. Putney noted that Plaintiff had a minimal decrease in function associated with her stable mood symptoms and was able to work when clean and sober, and as her physical limitations permitted. (Id.)

### 5.  The 2011 Raritan Bay Records

Plaintiff had psychiatric appointments at the Raritan Bay Mental Health Center ("Raritan Bay") on February 24, October 4, November 10, and December 28 of 2011, during which she complained of being depressed and anxious. (Tr. 897–900.) Plaintiff also went to Raritan Bay for psychiatric follow-up visits on July 11, July 27, August 24, September 15, September 28, October 12, October 26, November 13, and December 21 of 2011, and on January 18, February 16, and March 8 of 2012. (Tr. 906–12.)

Plaintiff's appeal is based, in substantial part, on the fact that the record before the ALJ did not include treatment records from Raritan Bay dating from July 11, 2011, until October 26, 2011. I thus concentrate on them in some detail.

On July 13, 2011, Plaintiff went to Raritan Bay for an initial intake with Eulics Montiel-Fernandez, LCSW, a senior bilingual social worker. (Tr. 887.)  The report showed that Plaintiff sought help because she had a history of psychiatric treatment, deterioration of physical health and lack of medical treatment due to lack of health insurance, marital problems, and the death of her sister earlier in 2011. (Id.)  Plaintiff reported difficulties in falling and staying asleep, loss of appetite, weight loss, withdrawal, feelings of worthlessness, hopelessness, and restlessness, crying, excessive anger, loss of interest in usual activities, irritability, low frustration tolerance,

nausea, abdominal pain, worry, fear, rumination, anticipation of misfortune, impatience, feelings of isolation, and lack of intimate connection with others. (Tr. 888.) Plaintiff claimed that she had been separated from her husband for about a year due to her lack of interest in sexual activity. (Tr. 889.)

Plaintiff reported that her first husband was physically abusive and broke her nose several times. (Tr. 892.) She also reported that she had a false pregnancy in 1991 that was actually a tumor, and that she contracted hepatitis as a result of a blood transfusion after the procedure. (Id.) The LCSW reported that Plaintiff did not report current or previous suicidal ideation, intent, or behavior. (Id.) The LCSW also reported that Plaintiff was normal and coherent during the intake, but that her mood was depressed and her affect was somewhat flat. (Id.) The LCSW noted that Plaintiff exhibited no signs of psychosis, that she did not appear to have memory deficits, and that her concentration was unimpaired.

The LCSW diagnosed Plaintiff with the following: (1) Axis I: 296.32 Major Depressive Disorder, Recurrent, Moderate; 304.20 Cocaine Dependence, Sustained Full Remission; (2) Axis II: 799.9 Deferred; (3) Axis III: history of asthma, heart condition, liver cirrhosis, back pain, hepatitis A, B, & C, and sleep apnea; (4) Axis IV: problems with primary support group, and problems with access to health care services; and (5) Axis V: 60. (Tr. 893.) The LCSW recommended that Plaintiff undergo individual treatment with the LCSW and a possible psychiatric evaluation in the future if necessary. (Tr. 894.)

On August 17, 2011, went to Raritan Bay and saw Dr. Dinesh G. Patel,[1] who conducted a

_____

[1]     The records of this case contain more than one Dr. Patel. I have made every effort to make it clear, either explicitly or from the context, when I am referring to Dr. Dinesh Patel.

11

psychiatric evaluation of Plaintiff. (Tr. 902.) Dr. Dinesh Patel noted that Plaintiff complained of depression, anxiety, and sleep disturbances, which had persisted for over ten years. (Id.) Dr. Patel also noted that Plaintiff said she had tried to commit suicide to get attention the previous year in Florida by overdosing on pills. (Id.) Dr. Patel noted that Plaintiff's mood was depressed, her affect was anxious, and her stream of speech was rapid and pressured. (Tr. 904.) The doctor reported that Plaintiff was paranoid, but denied suicidal and homicidal ideation. (Tr. 905.) Dr. Patel diagnosed Plaintiff as follows: (1) Axis 1: Major Depressive Disorder, Cocaine Dependence (in remission), and impulse control; (2) Axis II: P.D. (NOS); R/O Borderline; (3) Axis III: hepatitis A, B, & C, liver cirrhosis, abnormal lips movement, sleep apnea, migraines; (4) Axis IV: problems with family, finances; and (5) Axis V: GAF = 50. (Id.)

On September 15, 2011, Plaintiff returned to Raritan Bay, and the social worker that saw Plaintiff reported that she had a chronic mental illness and needed medication on a daily basis. (Tr. 913.)

On October 26, 2011, Dr. Dinesh Patel completed a mental impairment questionnaire for Plaintiff. (Tr. 881.) In his report, Dr. Patel identified the following symptoms based on his assessment of Plaintiff: anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with weight change; decreased energy; thoughts of suicide; impairment in impulse control; generalized persistent anxiety; mood disturbance; persistent disturbances of mood or affect; paranoid thinking or inappropriate suspiciousness; emotional withdrawal or isolation; intense and unstable interpersonal relationships and impulsive and damaging behavior; hallucinations or delusions; hyperactivity; emotional lability; pressures of speech; memory impairment—short, intermediate or long term; and sleep disturbance. (Tr. 882.) Dr. Dinesh Patel also classified Plaintiff as unable to meet competitive standards in almost all mental abilities and

12

aptitudes needed to do unskilled work, including remembering work-like procedures, understanding and remembering very short and simple instructions, and maintaining attention for two-hour segments. (Tr. 883.) Dr. Patel classified Plaintiff as unable to meet competitive standards in all mental abilities an aptitudes to do semiskilled and skilled work, including understanding and remembering detailed instructions, carrying out detailed instructions, setting realistic goals or making plans independently of others, and dealing with stress of semiskilled and skilled work. (Tr. 884.) Dr. Dinesh Patel classified Plaintiff as unable to meet competitive standards for two of five mental abilities and aptitude needed to do particular types of jobs, including interacting appropriately with the general public and traveling in unfamiliar places. (Id.) In the same section, Dr. Patel classified Plaintiff as seriously limited but not precluded from maintaining socially appropriate behavior, adhering to basic standards of neatness and cleanliness, and using public transportation. (Id.) Dr. Patel's assessment also stated that Plaintiff's psychiatric condition exacerbated her experience of pain or other physical symptoms. (Id.)

Dr. Dinesh Patel noted that Plaintiff had marked functional limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 885.) Dr. Patel noted that Plaintiff had one or two episodes of decompensation within a twelve-month period, each of at least two weeks in duration. (Id.) Dr. Patel reported that he anticipated that Plaintiff's impairments or treatment would cause her to be absent from work more than four days per months, and that Plaintiff's impairment lasted or can be expected to last at least twelve months. (Tr. 886.) Dr. Patel also noted that Plaintiff was not a malingerer and that her impairments were reasonably consistent with the symptoms and functional limitations described in the report. (Id.)

13

## DISCUSSION

I.    **LEGAL STANDARDS**

    A.    **Standard of Review**

       This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C. § 405(g).  It is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder," but must give deference to the administrative findings.  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992); see also 42 U.S.C. § 405(g).  Nevertheless, the Court must "scrutinize the record as a whole to determine whether the conclusions reached are rational" and supported by substantial evidence.  Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (citations omitted).  Substantial evidence is "more than a mere scintilla" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation omitted).

       This Court may not set aside the ALJ's decision merely because it would have come to a different conclusion.  Cruz v. Comm'r of Soc. Sec., 244 F. App'x 475, 479 (3d Cir. 2007)).  However, "where there is conflicting evidence, the ALJ must explain which evidence he accepts and which he rejects, and the reasons for that determination." Cruz, 244 F. App'x at 479 (citing Hargenrader v. Califano, 575 F.2d 434, 437 (3d Cir. 1978)).  Where the ALJ has rejected competent medical evidence, the ALJ must adequately explain his reasons and provide the rationale behind his decision.  See Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986).  Given the totality of the evidence, including objective medical facts, diagnoses and medical opinions, and subjective evidence of pain, the reviewing court must determine whether the ALJ's decision is adequately supported.  See Curtain v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981).  Overall,

14

the substantial evidence standard is a deferential standard of review, which requires deference to inferences drawn by the ALJ from the facts, if they are supported by substantial evidence. Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999).

## B. Determining Disability

Pursuant to the Social Security Act, to receive SSI payments, a claimant must show that she is disabled by demonstrating that she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).  Taking into account the claimant's age, education, and work experience, disability will be evaluated by the claimant's ability to engage in her previous work or any other form of substantial gainful activity existing in the national economy.  42 U.S.C. § 1382c(a)(3)(B).  Thus, the claimant's physical or mental impairments must be "of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . . " Id.  Decisions regarding disability will be made individually and will be based on evidence adduced at a hearing.  Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000) (citing Heckler v. Campbell, 461 U.S. 458, 467 (1983)).  Congress has established the type of evidence necessary to prove the existence of a disabling impairment by defining a physical or mental impairment as "an impairment that results from anatomical, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(C).

The SSA follows a five-step sequential evaluation process to determine whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920.  The evaluation will continue through

15

each step unless it can be determined conclusively at any point that the claimant is or is not disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

At step one, the claimant's work activity is assessed, and the claimant must demonstrate that he or she is not engaging in substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaging in substantial gainful activity, the analysis proceeds to the second step. At step two, the claimant must show that he or she has a medically determinable "severe" impairment or a combination of impairments that is "severe." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is severe when it significantly limits an individual's physical or mental ability to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). It is not severe when medical evidence shows only a slight abnormality or minimal effect on an individual's ability to work. See Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003). If the claimant has a severe impairment, the analysis proceeds to the third step.

At step three, the ALJ must determine, based on the medical evidence, whether the claimant's impairment matches or is equivalent to a listed impairment from the Social Security Regulations' "Listing of Impairments" found in 20 C.F.R. § 404, Subpart P, Appendix 1 (the "Listings"). 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the impairments are the same or equivalent to those listed, the claimant is per se disabled. 20 C.F.R. §§ 404.1520(d), 416.920(d); Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119 (3d Cir. 2000).

When the claimant does not suffer from a listed impairment or an equivalent, the analysis proceeds to step four. At step four, the ALJ must determine whether the claimant's RFC enables him or her to perform past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(ix), 416.920(a)(4)(iv). This step involves three sub-steps: (1) the ALJ must make specific findings of fact as to the claimant's RFC; (2) the ALJ must make findings as to the physical and mental demands of the

16

claimant's past relevant work; and (3) the ALJ must compare the RFC to the past relevant work

to determine whether the claimant has the capability to perform the past relevant work. Burnett,

220 F.3d at 120.  If the claimant lacks the RFC to perform any work he or she has done in the

past, the analysis proceeds to the fifth and final step.

At step five, the Commissioner must show that, based on the claimant's RFC and other

vocational factors, there is a significant amount of other work in the national economy that the

claimant can perform.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  During this final step,

the burden lies with the government.  See Rutherford v. Barnhart, 399 F.3d 546, 551 (3d Cir.

2005); Sykes, 228 F.3d at 263.  If the Commissioner cannot show there are a significant number

of other jobs for the claimant in the national economy, then the claimant is disabled.  20 C.F.R.

§§ 404.1520(a)(4)(ix), 416.920(a)(4)(iv).

## II.   SUMMARY OF THE ALJ'S FINDINGS

After reviewing all of the evidence in the record, the ALJ determined that Plaintiff was

not disabled and denied her claim for SSI benefits. (Tr. 17.)  The ALJ arrived at his decision by

following the required five-step sequential analysis.

### A.   Steps One and Two

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity

since February 25, 2009, the onset date. (Tr. 19.)  At step two, the ALJ found that Plaintiff had

the following severe impairments: degenerative disc disease, hepatitis, and cardiomyopathy. (Id.)

The ALJ also found that Plaintiff had non-severe impairments of major depression and

borderline personality disorder. (Id.)  The ALJ found that Plaintiff had no limitation in the

functional area of episodes of decompensation, and that Plaintiff had only mild limitations in the

functional areas of activities of daily living, social functioning, and concentration, persistence, or

17

pace. (Tr. 20.)

**B.     Step Three**

At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the impairments on the Listings. (Tr. 21.)

With respect to Plaintiff's spinal impairments, the ALJ found that the evidence was not sufficient for Plaintiff to meet the requirements of Listings Section 1.04 (Disorders of the Spine). (Tr. 22.)  The ALJ evaluated Plaintiff's hepatitis under Listings Section 5.05 (Chronic Liver Disease) and found that Plaintiff's condition did not satisfy requirements A through G. (Id.) Finally, when evaluating Plaintiff's cardiomyopathy, the ALJ found that Plaintiff did not meet the requirements of Listing Section 4.02 because she did not completely satisfy subsections A and B. (Id.)  The ALJ also reviewed the other impairments in Listing Section 4.00 and found that no criteria had been met or equaled. (Id.)

**C.     Step Four**

At step four, the ALJ determined that Plaintiff had the RFC for the following:

> lifting and carrying objects weighing up to 20 pounds; frequently
> lifting and carrying objects weighing up to 10 pounds; standing,
> walking, and sitting up to six hours in an eight-hour day; pushing
> and pulling arm and leg controls; and the full range of light work
> as defined in 20 CFR 416.967(b). The [Plaintiff] has not had any
> significant non-exertional limitations.

(Id.)  In making this finding, the ALJ considered Plaintiff's symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 416.929 and SSRs 96–4p and 96–7p. (Id.)  The ALJ also considered opinion evidence in accordance with the requirements of 20

18

C.F.R. § 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p. (Id.)

When considering a claimant's symptoms, an ALJ must engage in a two-step process. First, the ALJ must determine whether the claimant suffers from an underlying "medically determinable impairment that could reasonably be expected to produce [the claimant's] symptoms, such as pain." 20 C.F.R. § 416.929(b). Second, the ALJ must "evaluat[e] the intensity and persistence of [the claimant's] symptoms, such as pain, and determin[e] the extent to which [those] symptoms limit [claimant's] capacity for work. Id. § 416.929(c). However, whenever the claimant's statements are not substantiated by objective medical evidence, the ALJ is required to make a finding on the credibility of the statements based on the entire record. Id. § 416.929.

Here, the ALJ found that the evidence failed to establish a finding of disability in Plaintiff's case. (Tr. 22.) The ALJ noted that although the record contained treatment records from the Morton Plant Hospital from 2009, when Plaintiff complained of chest pain, the ALJ noted that Plaintiff's cardiac enzymes and EKG were normal, and her doctors concluded that Plaintiff's pain was almost certainly non-cardiac in nature. (Tr. 23.) The ALJ noted that Plaintiff was a tobacco smoker and was strongly advised during each visit to stop smoking. (Id.)

The ALJ stated that Plaintiff's allegations of back pain, difficulty standing, and walking and sitting for less than one-half hour, were not supported by the medical evidence to the degree alleged. (Tr. 25.) The ALJ considered the results of a July 2009 consultative examination. (Id.) That examination revealed a decreased range of motion in the lumbar spine, but there was no evidence of strength, motor, or sensory deficits in the bilateral lower extremities. (Id.) A chest x-ray showed no more than degenerative joint disease of the thoracic spine. (Id.) The ALJ noted that medical records failed to note any significant orthopedic findings that would substantiate

19

Plaintiff's complaints of intractable back pain. (Id.)

With respect to Plaintiff's cardiac impairment, the ALJ considered records from the Heart and Vascular Institute of Florida, which showed cardiomyopathy, but did not show evidence of congestive heart failure. (Id.)  The ALJ also considered the opinions of the State Agency physicians, whose assessments stated that Plaintiff had the ability to perform medium work, meaning she could lift and carry fifty pounds, frequently lift twenty-five pounds, and stand, walk, and sit for six hours of an eight-hour work day. (Id.)  The State Agency physicians also noted that Plaintiff would have frequent manipulative limitations. (Id.)  The ALJ found that these opinions were not supported by the medical evidence and concluded that Plaintiff would likely have difficulty carrying up to fifty pounds, and would therefore be limited to only light work. (Id.)  The ALJ also found that the State Agency's restriction regarding fine manipulation was not supported by the medical evidence or by the July 15, 2009 report of the consultative examiner, who found that Plaintiff's fine manipulation was intact and that she had good use of both hands. (Id.)  Additionally, the ALJ did not accord any weight to the State Agency's assessment of moderate mental limitations because they were not supported by medical evidence. (Id.)  The State Agency's assessment of Plaintiff's mental limitations was in direct contrast to their written analyses. (Tr. 26.)  The State Agency's explanations of the written analyses were consistent with the finding that Plaintiff had a non-severe mental impairment. (Id.)

In sum, the ALJ concluded that, although Plaintiff may have experienced some pain and discomfort from her condition, her subjective complaints of pain were in excess of what could reasonably be expected from the objective medical evidence. (Tr. 25.)  Additionally, the ALJ found that the medical records in evidence supported Plaintiff's RFC for the full range of light work. (Id.)

**D.     Step Five**

Having concluded that Plaintiff was able to perform light work and that her complaints were in excess of what could reasonably be expected from her medical condition, the ALJ then proceeded to step five of the analysis.  At step five, the ALJ found that a significant number of jobs that Plaintiff was capable of performing existed in the national economy. (Tr. 26.)  The ALJ finally concluded: "Based on a residual functional capacity for the full range of light work, considering [Plaintiff's] age, education, and work experience, a finding of 'not disabled' is directed by Medical-Vocational Rule 202.10." (Id.)

## ANALYSIS

Plaintiff argues that the ALJ erred in three respects. (Pl.'s Br. II.)  First, Plaintiff asserts that the ALJ failed to adequately develop the record under case law and 20 C.F.R. § 416.1512(D)–(F), because he did not have the benefit of certain Raritan Bay mental health records from July 11 through October 26, 2011. (Pl.'s Br. 23–25.)  Second, Plaintiff argues that the ALJ's findings regarding Dr. Greenberg's report were not supported by substantial evidence. (Pl.'s Br. 25.)  Third, Plaintiff contends that the ALJ rejected the opinion from Directions for Mental Health, Inc. without properly considering it as required by Third Circuit case law and the regulations. (Pl.'s Br. 26.)  I agree, and will remand this matter to the ALJ for development of the record and a complete reconsideration of Plaintiff's claimed combination of physical and mental impairments.

### A.     The Record, Which Lacked Certain Raritan Bay Records, Was Incomplete

Plaintiff argues that the ALJ never obtained or reviewed Plaintiff's mental health records from Raritan Bay Mental Health Center ("Raritan Bay"), for the period July 11, 2011, until October 26, 2011 (the "Raritan Bay records"). (Pl.'s Br. 24.)  Plaintiff requests that the Court

21

remand this case so that this "new evidence" (primarily treatment notes of Dr. Dinesh G. Patel) may be made part of the administrative record. (Pl.'s Br. 25.)  The Commissioner responds that Plaintiff failed to alert the ALJ to the existence of these records, and that, in any event, the Appeals Council (the "AC") reviewed them. (Def.'s Br. 15–16.)

### 1.    Legal Standards Governing a Sentence Six Remand

A claimant may proffer in the district court evidence that was not previously presented to the ALJ. Matthews v. Apfel, 239 F.3d 589, 592 (3d Cir. 2001).  The district court may then remand to the Commissioner, subject to the requirements of sentence six of 42 U.S.C. § 405(g). (This is sometimes referred to as a "Sentence six remand.") Section 405(g) states, in pertinent part: "The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." Id.

The Third Circuit, interpreting section 405(g), has held that a district court may remand the case to the Commissioner if the evidence proffered is new and material, and if the claimant demonstrates "good cause for not having incorporated the new evidence into the administrative record." Szubak v. Sec'y of Health & Human Servs., 745 F.2d 831, 833 (3d Cir. 1984); see also Matthews, 239 F.3d at 592. To be "new," the evidence must be not merely cumulative. 745 F.2d at 833 (citing Bomes v. Schweiker, 544 F. Supp. 72, 75–76 (D. Mass. 1982)).  To be "material," the evidence must be relevant and probative, and there must be "a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination." Id. At a minimum, the new evidence must relate "to the time period for which benefits were denied." Id. Finally, the claimant must demonstrate "good cause for not having [previously] incorporated the

new evidence into the record." Id. (citing Brown v. Schweiker, 557 F. Supp. 190, 192 (M.D. Fla. 1983)).

### 2.    The Records Are New And Material

The Raritan Bay records, dating from July 11, 2011, until October 26, 2011, are clearly "new" evidence in that they were not considered by the ALJ before. See Szubak. 745 F.2d 831; see also Matthews, 239 F.3d 589. It is hard to blame the ALJ for this. The ALJ hearing took place on July 5, 2011, before the records existed. It is true that Plaintiff twice mentioned at that hearing that she had scheduled an appointment to undergo treatment for her depression on July 11, 2011, and perhaps this should have alerted the ALJ to seek the records later. The AC rendered its decision on March 25, 2013, after the Raritan Bay records had come into existence, and the AC did review them. (Tr. 1.) Nevertheless, the ALJ did not possess any portion of those Raritan Bay records when he rendered his decision on August 31, 2011.

The Raritan Bay records are not cumulative of material already in the record.  The evidence of record focused primarily on Plaintiff's physical health, rather than her mental health. Indeed, Plaintiff's mental health therapy did not begin in earnest until after the ALJ hearing. Thus the Raritan Bay records, for understandable reasons, provide more insight into Plaintiff's mental health than the prior records did. See Hawkins for Reilly v. Heckler, 631 F. Supp. 711, 715 (D.N.J. 1985) (noting that a psychological report was new evidence because it discussed in detail the history of the claimant's mental illness, and finding that the report was to be "given serious consideration [upon remand] as there [was] a 'reasonable possibility' that this evidence may have changed the ALJ's decision").

There is a reasonable possibility that the new records from Raritan Bay would have changed the ALJ's decision. See Szubak, 745 F.2d at 831.  The ALJ stated in his opinion, as to

23

Plaintiff's physical symptoms, that her "subjective complaints of pain are far in excess of what could reasonably be expected from her medical condition and the objective medical evidence." (Tr. 22.)  The new records, however, provide some badly needed context. They could be viewed as lending further support to Plaintiff's subjective complaints of pain. Further, they might have tended to rebut the implied charge of malingering, as to which Plaintiff's mental state and capabilities are highly pertinent.  Dr. Dinesh Patel reported that Plaintiff was mostly unable to meet competitive standards as to mental ability. (Tr. 883–84.)  Dr. Patel also reported that Plaintiff had marked functional limitations in several areas, including activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 885.) Dr. Patel was also of the opinion that Plaintiff was not a malingerer and that her impairments were reasonably consistent with the symptoms and functional limitations described in the report. (Tr. 884.)  This corroboration by a treating professional is "entitled to great weight by the ALJ." Szubak, 745 F.2d at 833.

At the very least, these mental health records further buttress Plaintiff's claim that she suffered from a mental disability, which, in combination with physical health problems, might constitute a "combination of impairments" that meet the standards for SSI.

### 3. Even Setting Aside the Time Frame of the Records, Plaintiff's *Pro Se* Status Would Constitute Good Cause

A claimant seeking to introduce new evidence must establish good cause for failing to introduce it earlier. As noted above, all of the Raritan Bay records in question date from after the ALJ hearing, and most from after the ALJ's decision. That in itself might meet the good cause standard. I note in addition that the standard should be construed liberally in light of Plaintiff's status as a *pro se* claimant.

24

In determining whether a claimant is entitled to social security disability benefits, an ALJ has a "heightened level of care and the responsibility . . . to assume a more active role when the claimant is unrepresented." Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979). In Dobrowolsky, the Third Circuit noted that although a claimant's lack of counsel is not itself a sufficient basis for remand, it is "sufficient cause for remand only if supported by a showing of clear prejudice or unfairness at the administrative hearing." Id. The Dobrowolsky court found that the claimant was in fact prejudiced by his lack of representation, because the ALJ should have requested additional evidence on the basis of the claimant's testimony. Id. at 408. If Dobrowolsky had been represented by counsel, the court stated, the additional evidence helpful to his case "undoubtedly would have been pursued." Id.

In Plaintiff's case, as in Dobrowolsky, the transcript of the hearing reveals that Plaintiff twice stated that she had scheduled an appointment to undergo treatment for her depression on July 11, 2011. (Tr. 38.) The ALJ did not address this circumstance or ensure that Plaintiff understood the potential importance of those records to the disability decision. (Id.). Nor is there any indication that the ALJ followed up on obtaining the records after July 11, 2011. (Tr. 78.) In his August 2011 decision, the ALJ stated that Plaintiff "currently receives no treatment for depression" and that she had "testified that she receives no treatment for depression." (Tr. 21, 22.) The latter statements, at least, is technically true, but the ALJ without explanation set aside Plaintiff's statements that she was about to get such treatment, and did not consider that, by the time of the decision, she had in fact started a course of mental health treatment.

The Commissioner contends Plaintiff herself is to blame for failing to furnish the Raritan Bay records. After the hearing, the ALJ requested updated information, and Plaintiff did not bring the Raritan Bay records or Dr. Dinesh Patel to the ALJ's attention. (Def.'s Br. 15.) I

25

consider that argument, however, in the context of an ALJ's duty, especially where a claimant is unrepresented, to develop the record and inform the claimant that vital data is missing. Hawkins, 631 F. Supp. at 714. Indeed, Hawkins held specifically that "omission to inform a claimant of the desirability of securing medical reports from a treating physician is cause for remand." Id. (citing Singleton v. Schweiker, 551 F. Supp. 715 (E.D. Pa. 1982)). But see Anthony v. Comm'r of Soc. Sec., No. 1:12CV02706, 2013 WL 6840359, at *7 (N.D. Ohio Dec. 27, 2013) (finding that one reason for denying a sentence six remand based on the ground that claimant was unrepresented was that he "failed to inform the ALJ about upcoming medical appointments").[2]

Plaintiff has a tenth-grade education, and is unfamiliar with the legal process. Until August 13, 2012 (ten days before the ALJ rendered his decision), she had no legal representation at all. The period between the administrative hearing on July 5, 2011 and the issuance of the decision on August 23, 2011, was less than two months, requiring Plaintiff to act quickly to submit the limited additional information that was then available. These circumstances, too, contribute to a showing of good cause for failure to submit the Raritan Bay information earlier. See Anthony, 2013 WL 6840359, at *8 (citing Marok v. Astrue, No. 5:08CV 1832, 2010 WL 2294056, at *2 (N.D. Ohio June 3, 2010)) (finding that a period of less than two months between the hearing and the ALJ's decision may require "some higher level of education or intelligence [of a plaintiff] to [know how to] act within that short period").

Because the Raritan Bay records are new and material, and because there is good cause

─────────────────────

[2] Plaintiff also notes in her reply brief that there was perhaps a misunderstanding with the ALJ. The ALJ told Plaintiff that she needed to sign a release so that the ALJ could request certain updated records. ((Pl.'s Reply Br. 2; Tr. 46.) Although the ALJ may have been referring to Plaintiff's old records, Plaintiff might just as easily have concluded that post-hearing records would be included.

for the claimant's failure to incorporate them into the record, this Court finds that there are adequate grounds for a Sentence six remand, pursuant to 42 U.S.C. § 405(g). The matter will be remanded for reconsideration in light of a record supplemented to include the Raritan Bay records for the period July 11, 2011, until October 26, 2011.

**B.   The Finding that Plaintiff's Mental Health Impairments Were Non-Severe Will be Vacated and Remanded Based on the ALJ's Inadequate Consideration of Certain Evidence**

Plaintiff asserts that the ALJ's finding that Plaintiff's mental health impairments were not severe was not based on substantial evidence. (Pl.'s Br. 25.)  The ALJ, according to Plaintiff, failed to provide adequate reasons for rejecting the reports from Directions for Mental Health, and cited no evidence in support of his conclusion that the Plaintiff's GAF scores as assessed by DMH were based solely on subjective complaints. ("DMH"). (Pl.'s Br. 26–28.)

I find that remand is necessary because the ALJ (1) failed to consider Plaintiff's records from DMH; (2) failed to substantiate his conclusion that Plaintiff's GAF assessments (from DMH records and from Dr. Greenberg's report) indicating serious to moderate mental health limitations were based only on subjective complaints; and (3) failed to adequately explain why he rejected the GAF scores but adopted Dr. Ragsdale's opinion.

**1.   Standard Of Review**

Where the Commissioner has rejected competent medical evidence, the ALJ must adequately explain his reasons and provide the rationale behind his decision. See Brewster v. Heckler, 786 F.2d 581, 585 (3d Cir. 1986).  Given the totality of the evidence, including objective medical facts, diagnoses, medical opinions, and subjective evidence of pain, the reviewing court must determine whether the Commissioner's decision is adequately supported. See Curtain v. Harris, 508 F.Supp. 791, 793 (D.N.J. 1981).  Generally, medical opinions

consistent with other evidence are given more weight while opinions inconsistent with the evidence or with themselves are subject to additional scrutiny. 20 C.F.R. § 416.927.  Overall, the substantial evidence standard requires deference to inferences drawn by the ALJ from the facts if those inferences are supported by substantial evidence. Schaudeck, 181 F.3d at 431.  District courts may review decisions of the Commissioner of Social Security to make sure that they are supported by "substantial evidence." See Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999) (citing Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994)).

Remand is appropriate where a portion of the ALJ's decision is not substantiated, making it "impossible to determine whether the ALJ's finding . . . is supported by substantial evidence." See Fargnoli v. Massanari, 247 F.3d 34, 40 (3d Cir. 2001).  Remand is the appropriate remedy where an ALJ has failed to explain the reasoning behind his or her findings, as required under SSR 96–8p. Pearson v. Barnhart, 380 F. Supp. 2d 496, 506–08 (D.N.J. 2005) (citations omitted); see also Fargnoli 247 F.3d at 41 ("[T]he ALJ's finding of residual capacity must be accompanied by a clear and satisfactory explication of the basis on which it rests." (quoting Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981))); Kress v. Barnhart, 297 F. Supp. 2d 623, 624 (W.D.N.Y. 2004) (ALJ failed to "explain adequately the basis" of the RFC determination).

### 2.   Failure to State Adequate Reasons For According Little Weight to Certain Records Pertaining to Mental Impairments.

Plaintiff's next claim of error pertains to the consultative examination report of Dr. Greenberg (see pp. 5-6, supra) and certain records from DMH (see pp. 3-5, supra).  First, Plaintiff alleges that the ALJ erred in basing his findings regarding Plaintiff's mental health solely on Dr. Greenberg's report. (Pl.'s Br. 25.) Second, Plaintiff contends that the ALJ erroneously interpreted Dr. Greenberg's report when the ALJ relied on it to conclude that

28

Plaintiff had no more than slight or minimal limitations in her ability to perform basic mental work activities. Third, Plaintiff contends that the ALJ failed to give adequate reasons for rejecting the records from DMH, which reflect official diagnoses of a mood disorder, major depression, and low GAF assessments. (Tr. 371, 777, 367.) Plaintiff requests a remand so that the ALJ can reconsider his conclusions in light of a proper assessment of Dr. Greenberg's report and the reports of the DMH professionals. (Pl.'s Br. 26–27.)

In Matullo v. Bowen, Third Circuit noted that, "[i]n order for an ALJ to reject a claim of disabling pain, he must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." 926 F.2d 240, 245 (3d Cir. 1990) (citing Baerga v. Richardson, 500 F.2d 309, 312 (3d Cir. 1974)). The Third Circuit has also stated that "[a]n ALJ must give great weight to a claimant's subjective testimony of the inability to perform even light or sedentary work when this testimony is supported by competent medical evidence." Schaudeck, 181 F.3d at 433 (citing Dobrowolsky, 606 F.2d at 409). Additionally, medical opinions consistent with other evidence should be accorded more weight, and opinions inconsistent with other evidence or with themselves should be subject to further scrutiny. 20 C.F.R. § 416.927.

The ALJ stated that even though "the record contain[ed] some low GAF assessments in reports in the 40's and 50's, which were indicative of serious to moderate mental limitations, these assessments are based on subjective complaints and are accorded no significant weight." (Tr. 20.) Here, the ALJ concluded that Plaintiff's GAF scores were solely based on subjective evidence, and set aside the medical evidence of severe mental health impairments. (Tr. 20.) There was, however, substantial competent medical evidence that supported Plaintiff's subjective complaints. At least six different doctors or medical facilities diagnosed Plaintiff with major

depression on at least nine different occasions from April of 2007 until May of 2011. (Tr. 249, 252, 362, 367, 432, 439, 536, 673, 799.)   These opinions consistent across the board, go far beyond a mere neutral reporting of a patient's subjective complaints. The ALJ did not adequately explain his rejection of this evidence.

Additionally, the ALJ did not provide an adequate explanation as to why he rejected Plaintiff's GAF scores, adopting instead Dr. Ragsdale's conclusion that Plaintiff's "symptoms did not preclude the demands of simple routine tasks in a full time work setting." (Tr. 19.)

To decide whether the ALJ's decision is adequately supported, this Court must weigh the totality of the evidence in reviewing the ALJ's decision, including objective medical facts, diagnoses, medical opinions, and subjective complaints. Curtain, 508 F.Supp. at 793.  Here, the ALJ did not support his decision to reject records reporting low GAF scores or to adopt Dr. Ragsdale's conclusion. See Brewster, 786 F.2d at 585.  Given that Dr. Ragsdale's opinion was inconsistent with other evidence and with Plaintiff's subjective complaints of pain, the ALJ should have provided an explanation for his conclusion that Plaintiff had no more than a mild limitation in the relevant functional area. See 20 C.F.R. § 416.927 (requiring that an ALJ give more weight to medical opinions consistent with other evidence, and carefully scrutinize opinions inconsistent with the evidence or with themselves).

Thus, this Court remands the case because the ALJ's treatment of the evidence as to Plaintiff's mental health impairments does not permit a conclusion that the findings were supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, the Court will vacate the final decision of the Commissioner and remand this case for further administrative proceedings consistent with this Opinion. On

remand, the ALJ is directed to do the following:

**(1)** Develop the record, particularly by including consideration of supplemental Raritan Bay mental health records from July 11 through October 26, 2011;

**(2)** Reconsider Plaintiff's Directions for Mental Health (DMH) records and the report of Dr. Greenberg, and adequately explain his reasons for rejecting or relying on competent medical evidence;

**(3)** Considering all of the evidence, old and new, perform a *de novo* analysis of whether the Plaintiff's mental and physical impairments, singly or in combination, render her unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

An appropriate order accompanies this Opinion.


DATED: July 7, 2014

KEVIN MCNULTY, U.S.D.J.